# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00555-CV

**C. W. 100 Louis Henna, Ltd., Appellant**

**v.**

**El Chico Restaurants of Texas, L.P., and El Chico Restaurants, Inc., Appellees**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT
NO. 07-857-C277, HONORABLE KEN ANDERSON, JUDGE PRESIDING**

## O P I N I O N

This is an appeal from a final summary judgment, on cross-motions, in a dispute between a landlord, appellant C.W. 100 Louis Henna, Ltd. (Henna), a tenant, appellee El Chico Restaurants of Texas, L.P. (El Chico), and the tenant's guarantor, El Chico Restaurants, Inc., over the proper construction of their commercial ground lease. The principal issue concerns whether air-conditioning units that El Chico installed on a building that the lease required it to construct are "improvements" that the lease obligated El Chico to maintain and deliver to Henna in good condition upon the lease's expiration, as Henna contends, or are trade fixtures that are excluded from the lease's definition of "improvements," as appellees argue. We agree with appellees that the air-conditioning units are trade fixtures and not "improvements" as a matter of law. Because this is one of the grounds on which the district court could have relied in granting summary judgment for appellees, we will affirm the judgment.

## BACKGROUND

The material underlying facts are undisputed. On September 24, 1996, El Chico and Henna's predecessor, Boardwalk Center, Ltd., entered into a ground lease of a parcel of land located in Round Rock that Boardwalk owned and was developing as part of a new retail shopping center. On the same day, El Chico Restaurants, Inc. signed an agreement to guarantee El Chico's obligations under the ground lease.

Among its other obligations under the ground lease, El Chico was required to construct a building on the parcel it was leasing (defined as the "Land") within the permissible building area reflected in the project's site plan and "pursuant to plans and specifications approved in writing by Landlord [Boardwalk]." The lease defined this "building and other improvements and appurtenances that may hereafter be erected" on the Land as the "Improvements" and defined the Land and Improvements collectively as the "Premises." The referenced "plans and specifications" included or depicted two 12.5-ton[1] air conditioning units and two 10-ton units (the "HVAC units"), which were to be installed on top of the building.

The lease authorized El Chico to use the Premises to operate a "restaurant, a related cocktail lounge, such other uses as are incidental to the operation thereof and for any other lawful purpose," subject to its complying with "all applicable governmental and regulatory requirements and regulations." The lease was to run for an initial term expiring on the tenth anniversary of the "Rent Commencement Date"—a date tied to when El Chico opened for business on the

---

[1] A "ton" is a measure of air conditioning power. It refers to the cooling power of one ton of ice melting in a 24-hour period. *Webster's Third New International Dictionary* 2407 (1986).

Premises—subject to El Chico's right to renew the lease for up to four additional terms of five years each. While the lease was in effect, El Chico would own the Improvements "hereafter constructed or placed on the Land during the Term," but El Chico had "no right to demolish, remove or alter the Improvements without Landlord's prior written consent." El Chico was further required to carry specified insurance on the Premises and "take good care of the Improvements during the Term, including repairs to the interior, exterior and structure, it being understood that Landlord shall not be required to maintain the Premises or make any repairs to the Improvements during the Term." At the end of the lease, El Chico was required to "deliver up the Land with the Improvements then situated thereon in good repair and condition, loss by fire or other casualty, condemnation, act of God, ordinary wear and tear, decay, depreciation and obsolescence being excepted," whereupon the Improvements were to "be and become the property of Landlord . . . without compensation therefor." However, paragraph 12 of the lease provided that "trade and business fixtures . . . shall not be deemed to be part of the Premises but shall remain the property of Tenant."

The "Rent Commencement Date" was in April 1997, which meant that the ten-year initial lease term ran until April 2007. The record reflects that, in April 2006, Boardwalk conveyed its interest in the Premises and the ground lease to Henna Blvd., L.L.C., which then assigned these interests to Henna. Around the same time, El Chico gave written notice to Henna Blvd., L.L.C. that El Chico had ceased doing business in the Premises and that it would permit the lease to expire at the end of the initial term without renewing it. In this document, El Chico also waived any rights it possessed under the lease that would have prevented Henna Blvd., L.L.C. (or Henna, its successor)

3

from marketing and selling or leasing the Premises, and El Chico agreed to execute a document terminating the lease upon the landlord's request if the landlord succeeded in selling or leasing the Premises.

In June 2006, El Chico sold Henna "all furniture, fixtures and equipment (collectively, the 'Assets') located, as of this date, in the El Chico® restaurant at 100 Louis Henna Boulevard, Round Rock." Henna acknowledged and agreed that it "ha[d] inspected the Assets at the Premises and [was] acquiring the Assets in their 'AS IS' condition." Around the same time, El Chico and Henna amended the ground lease to provide that effective June 23, 2006, Henna would assume responsibility for paying all charges for utility services at the Premises, including the security alarm system, and for maintaining the grounds around the Improvements. However, El Chico continued to make monthly rental payments through the end of the initial lease term in April 2007.

In January 2007, a few months before the lease's April expiration, Henna learned that the HVAC units on top of the restaurant building had been vandalized by copper thieves and damaged by hail. Henna obtained an estimate of $38,496 to repair the damage. A series of communications ensued between the parties or their agents in which it was disputed whether Henna or El Chico was responsible for repairing and/or insuring against the damage to the HVAC units. Eventually, in August and September of that year, counsel for Henna sent letters to both El Chico and, as guarantor, El Chico Restaurants, Inc., demanding payment of the $38,496 estimated repair amount. In October, Henna sued these entities.

4

Henna alleged that appellees were obligated under the ground lease to insure or repair the HVAC units and had failed to perform. It asserted a cause of action for breach of contract and sought damages and attorney's fees. Henna filed a "traditional" motion for partial summary judgment as to appellees' liability for breaching the lease. It attempted to conclusively establish each of the elements of its breach-of-contract cause of action; namely, that: (1) a valid contract existed between the parties; (2) Henna had performed or tendered performance; (3) appellees had breached the contract; and (4) Henna was damaged as a result of the breach. *See New York Life Ins. Co. v. Miller*, 114 S.W.3d 114, 121 (Tex. App.—Austin 2003, no pet.). Appellees filed a response and a "traditional" cross-motion in which they attempted to conclusively negate each of these elements, as well as Henna's entitlement to attorney's fees. Regarding breach, the parties joined issue as to whether the HVAC units are Improvements that appellees were obligated under the ground lease to repair or insure, as Henna argued, or are trade fixtures that were excluded from that obligation, as appellees contended. The parties also joined issue as to whether Henna had complied with the default or remedy provisions of the lease, whether Henna had incurred any damages, or whether Henna had any entitlement to attorney's fees. Following a hearing, the district court rendered final judgment denying Henna's summary-judgment motion and granting appellees' motion without stating the specific grounds on which it relied. Henna thereafter filed a motion for new trial, which the district court denied by written order following a hearing. This appeal ensued.

5

**ANALYSIS**

Henna brings twelve issues on appeal. It disputes whether appellees were entitled to prevail on any of the summary-judgment grounds presented in their motion—specifically, whether appellees conclusively negated the elements of breach (points five and six), Henna's performance (points seven and eight), damages (points nine and ten), or Henna's entitlement to attorney's fees (point twelve). Henna also brings a corresponding set of points complaining that the district court erred in denying Henna's summary-judgment motion. Henna asserts that it established each of the elements of its breach-of-contract cause of action as a matter of law: breach (points one and two), performance (point three), and damages (point four), and that it was entitled to attorney's fees (point eleven).

**Standard of review**

We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). In deciding whether there is a disputed material fact issue precluding summary judgment, we take as true proof favorable to the non-movant, and we indulge every reasonable inference and resolve any doubt in favor of the non-movant. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). Where, as here, the parties file cross-motions for summary judgment on overlapping issues, and the trial court grants one motion and denies the other, we should review the

6

summary-judgment evidence supporting both motions and "render the judgment that the trial court should have rendered." *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

As the movant in a "traditional" summary-judgment motion challenging Henna's breach-of-contract cause of action, appellees had the initial burden of conclusively negating at least one element of that cause of action (i.e., establishing one of the grounds in their motion as a matter of law). *See KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). Assuming appellees met that burden as to at least one element, the burden shifted to Henna to present summary-judgment evidence raising a genuine issue of material fact as to that element or elements. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 24 (Tex. 2000) (per curiam). Because the district court did not specify the ground on which it relied in granting appellees' motion, we may affirm the summary judgment if any ground is meritorious. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex. 1993).

If the district court properly granted appellees' summary-judgment motion, it follows that it did not err in denying Henna's motion on the same grounds. *See FM Props. Operating Co.*, 22 S.W.3d at 872. If we conclude that the district court erred in granting appellees' motion, then we consider whether it also erred in denying Henna's motion. To prevail on its motion, Henna had the burden of establishing its entitlement to judgment as a matter of law by conclusively establishing each element of its breach-of-contract cause of action. *See Willrich*, 28 S.W.3d at 23 (citing *Rhône-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222-23 (Tex. 1999); *Oram v. General Am. Oil Co.*, 513 S.W.2d 533, 534 (Tex. 1974) (per curiam)).

**"Improvements" versus trade fixtures**

Appellees' summary-judgment ground attacking the breach element of Henna's cause of action was premised on its argument that, as a matter of law, the HVAC units were "trade or business fixtures" under paragraph 12 of the ground lease and not "Improvements" that the lease required them to repair or insure. Henna challenges this legal conclusion in its fifth issue, contending that the district court erred in granting summary judgment on this ground because the HVAC units were instead "Improvements" as a matter of law, or that at least a fact issue remains as to the parties' intent. Similarly, in its first issue, Henna argues that because the HVAC units were "Improvements" as a matter of law, it established the breach element of its cause of action as a matter of law. Our resolution of these issues turns on construction of the ground lease. *See Tempo Tamers, Inc. v. Crow-Houston Four, Ltd.*, 715 S.W.2d 658, 664 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) (observing that such issues turn on the parties' intent, which courts ascertain by looking to relevant provisions of a contract governing their use of the realty); *Jim Walter Window Components v. Turnpike Dist. Ctr.*, 642 S.W.2d 3, 4 (Tex. App.—Dallas 1982, writ ref'd n.r.e.) ("The intent of the parties regarding the right to remove additions at the termination of a lease is to be determined from the provisions of the lease agreement.").

When we construe a written contract, such as the ground lease, our primary concern is to ascertain and give effect to the intentions the parties have objectively manifested in that instrument. *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005) (per curiam); *see Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006) ("As with any other contract, the parties' intent is governed by what they said, not by what they *intended* to say but did

8

not."). To that end, we construe the lease in its entirety, considering each part in relation to every other part so that the effect of each part on others may be determined and that no part will be rendered meaningless. *See City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005); *Valence Operating Co.*, 164 S.W.3d at 662. Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence Operating Co.*, 164 S.W.3d at 662. In determining the meaning of contract terms, we may also consider the context of the circumstances existing at the time the contract was executed and the particular business activity sought to be served. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996); *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987). If we can give the contract a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law. *Willis v. Donnelly*, 199 S.W.3d 262, 275 (Tex. 2006); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). If, on the other hand, the contract is subject to two or more reasonable interpretations, it is ambiguous, which creates a fact issue as to the parties' intent. *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589. Whether a contract is ambiguous is a question of law. *Id.*

At the center of the parties' competing contentions is paragraph 12 of the lease, which explicitly excludes "trade or business fixtures" from "Improvements":

12.     Equipment, Fixtures and Signs

(a)     Tenant shall have the right to erect, install, maintain and operate on the Premises such equipment, *trade and business fixtures*, signs (including, without limitation, pylon signage) and other personal property as Tenant may deem necessary or appropriate, *and such shall not be deemed to be part of the Premises, but shall remain the*

9

*property of Tenant*. Any such installations shall be in accordance with applicable local codes and Tenant's pylon signage and monument signage, if applicable, shall be installed in those locations designated therefor as reflected in the Site Plan. At any time during the Term and within thirty (30) days after the expiration or termination of the Term, Tenant shall have the right to remove all or any part of Tenant's equipment, *removable fixtures*, signs (including, without limitation, its pylon signage, if any) and other personal property from the Premises, provided that Tenant repairs all damage to the Improvements caused by such removal. Any property remaining in the Improvements after such thirty (30) day period shall be deemed to have been abandoned by Tenant.

(Italics added.) Because the "Premises" from which "trade or business fixtures" are excluded are defined elsewhere in the lease to mean the "Land" plus the "Improvements," paragraph 12 means that anything constituting a "trade or business fixture" (or, for that matter, anything constituting "such equipment, . . . signs . . . and other personal property as Tenant may deem necessary or appropriate" to install or operate on the Premises) cannot be an Improvement.

The ground lease does not contain a definition of trade or business fixtures. However, the term "trade fixture" has acquired a well-established, commonly understood meaning in Texas law. As one of our sister courts has observed:

The term "trade fixture" has been defined many times by the courts. . . . "It is now well settled that, as between a landlord and his tenant, the term 'trade fixtures' refers to and means such articles as may be annexed to the realty by the tenant to enable him properly or efficiently to carry on the trade, profession, or enterprise contemplated by the tenancy contract or in which he is engaged while occupying the premises, and which can be removed without material or permanent injury to the freehold."

10

*Boyett v. Boegner*, 746 S.W.2d 25, 27 (Tex. App.—Houston [1st Dist.] 1988, no writ) (quoting *Granberry v. Texas Pub. Serv. Co.*, 171 S.W.2d 184, 186 (Tex. Civ. App.—Amarillo 1943, no writ)). It is also well established that trade fixtures are distinguished from "improvements" and other types of fixtures (i.e., personal property affixed to realty). "An improvement includes all additions to the freehold except for trade fixtures which can be removed without injury to the property." *Sonnier v. Chisholm-Ryder Co.*, 909 S.W.2d 475, 479 (Tex. 1995); *see also Reames v. Hawthorne-Seving, Inc.*, 949 S.W.2d 758, 761 (Tex. App.—Dallas 1997, pet. denied) ("The class of improvements is considered to be broader than that of fixtures, which are items of personalty that have become permanent parts of the realty to which they are affixed. Therefore, although all improvements are not necessarily fixtures, any fixture, unless it is a trade fixture, is considered an improvement. A trade fixture is an item, which can be removed without material or permanent injury to the freehold, that a tenant annexes to realty to enable the tenant to carry on its business." (Citations omitted.)). The rationale for these distinctions is that "[i]mprovements made by a vendor, mortgagor or ancestor are made to enhance the value of the estate, and to be permanent; while those made by the tenant are temporary and made for purposes of his trade." *Jim Walter Window Components*, 642 S.W.2d at 5 (quoting *Menger v. Ward*, 28 S.W. 821, 823 (Tex. Civ. App.—San Antonio 1894), *rev'd on other grounds*, 30 S.W. 853 (Tex. 1895)).

The drafters' use of "trade or business fixtures" within paragraph 12 without providing definitions of these terms that would be unique to this agreement suggests their intent to employ the well-established definitions and concepts set out in case law. After granting the tenant the right to install or maintain "equipment," "*trade or business fixtures*," "signs," and "other personal

11

property," paragraph 12 provides the tenant a corresponding right to remove all or part of its "equipment," "*removable fixtures*," "signs," and "other personal property from the Premises, provided that Tenant repairs all damage to the Improvements caused by such removal." This usage reflects that, consistent with the common meaning of trade fixtures in Texas law, "trade or business fixtures" under the lease are considered to be removable personal property. Similarly, paragraph 12 excluded "trade or business fixtures" from the lease's definition of "Improvements," just as trade fixtures are excluded from improvements under Texas law.

Appellees conclusively established that the HVAC units at issue met the commonly understood definition of trade fixtures. They presented uncontroverted summary-judgment evidence that the HVAC units were not attached to the building, but were designed to be and were placed on curbs on the roof so they could be removed and replaced without injury to the building, and that such units needed to be replaced periodically as they reached the end of their useful life cycles. Appellees likewise presented undisputed evidence that the HVAC units here were approaching the end of their useful lives, and that the units ultimately were replaced without injury to the building. Further, appellees presented uncontroverted summary-judgment evidence that the 45 tons of air-conditioning capacity provided by the HVAC units facilitated the building's use as a restaurant, but was many times greater than that needed if the building were to be used for other retail or office use. Several Texas courts, addressing similar facts, have held that air-conditioning units are trade fixtures as a matter of law. *See Boyett*, 746 S.W.2d at 27-28; *White v. Cadwallader & Co.*, 299 S.W.2d 189, 190-92 (Tex. Civ. App.—San Antonio 1957, writ ref'd n.r.e.); *Moskowitz v. Calloway*, 178 S.W.2d 878, 879-80 (Tex. Civ. App.—Texarkana 1944, writ ref'd w.o.m.); *cf. Nine Hundred Main, Inc. v.*

*City of Houston*, 150 S.W.2d 468, 471-73 (Tex. Civ. App.—Galveston 1941, writ dism'd judgm't

cor.) (distinguishing tenant-installed air-conditioning system that had been constructed in a manner

making it an integral part of the building).

Henna correctly observes that there is no rule or presumption in Texas law that air-

conditioning units are always trade fixtures. The issue, rather, turns on the parties' intent, which

here we ascertain from the ground lease. *See Tempo Tamers, Inc.*, 715 S.W.2d at 664. Henna argues

that portions of the ground lease outside paragraph 12 reflect the drafter's intent that the HVAC units

be considered "Improvements" under the lease and that this definition, not the commonly understood

definitions of improvements and trade fixtures, must control. *See id.* at 664-66 (example of

case where lease language demonstrated that "the parties in this case could not have reasonably

intended that 'trade fixtures' have the legal meaning ascribed to it by the courts"). Henna relies on

paragraph 1 of the lease, which defines "Improvements" as "any building and other improvements

and appurtenances that may hereafter be erected" on the Land, in conjunction with paragraph 5:

> 5. <u>Construction</u>. The Improvements shall be constructed and situated on the
> Land within the permissible building area reflected on the Site Plan and pursuant to
> plans and specifications approved in writing by Landlord; provided, however, that
> Tenant shall have the right to revise the permissible building area and the approved
> plans and specifications subject to Landlord's prior written consent, which consent
> shall not be unreasonably withheld or delayed. Notwithstanding anything contained
> herein to the contrary, however, Landlord hereby consents to and approves of the
> prototypical plans and specifications which are being used by Tenant on the Effective
> Date of this Lease and hereby agrees that Tenant shall have the right to construct the
> Improvements without any further consent by Landlord so long as the Improvements
> are constructed generally in accordance with such prototypical plans. . . .

13

Henna presented uncontroverted summary-judgment evidence that the "plans and specifications" referenced in paragraph 5 included a drawing of a four-unit, 45-ton HVAC system like that El Chico later installed. Thus, Henna reasons, the "Improvements [that] shall be constructed . . . pursuant to plans and specifications" under paragraph 5 included the HVAC units that El Chico later installed.

Based on this premise, Henna argues that paragraph 5 evinces the drafters' agreement and intent to impose an obligation on El Chico to include the HVAC units at issue when constructing the building. Henna also relies on paragraphs 6 and 30 of the ground lease for a similar proposition. Paragraph 6 authorized El Chico to use the Premises "for the operation of a restaurant . . . and for any other lawful purpose, subject, however, to . . . all applicable governmental and regulatory requirements and restrictions." Similarly, paragraph 30 provided that, during the lease term, "Tenant . . . shall conform to and comply with all ordinances, regulations and laws (federal, state, or municipal) . . . affecting the Premises. . . ." Henna presented summary-judgment evidence that El Chico had obtained a certificate of occupancy for its restaurant from the City of Round Rock based on the plans and specifications. From this, Henna reasons that El Chico had obligations under paragraphs 6 and 30 to install the HVAC units in order to comply with this "regulatory requirement."

The existence of these agreements and obligations on the part of El Chico to install the HVAC units when constructing its restaurant building, Henna further reasons, distinguishes the HVAC units from a trade fixture, which, Henna asserts, is characterized by a tenant's unilateral decision to affix personalty to an existing building that the tenant has leased. Relatedly, Henna argues that the HVAC units were part of the consideration the landlord bargained to obtain under the ground lease. In sum, Henna urges that "[t]he decision to originally incorporate the HVAC system

14

was neither unilateral nor voluntary; rather, such decision was bilateral, between El Chico and its landlord, as well as required under the plans and specifications incorporated into the ground lease, itself, of course, the product of arms-length negotiation between the parties, a factual distinction absolutely determinative in the present appeal."

The chief flaw in Henna's reasoning is its foundational premise that the ground lease's definition of "Improvements" encompassed the HVAC units because the plans and specifications called for two 12-ton units and two 10-ton units like El Chico installed. Contrary to Henna's argument, paragraph 5 does not purport to incorporate into the lease's "Improvements" definition whatever property might have been depicted in the plans and specifications. Paragraph 5 requires that "[t]he *Improvements* shall be constructed . . . pursuant to [the] plans and specifications," which means that the Improvements must be constructed in a manner carrying out or in conformity with the plans and specifications.[2] It does not follow from this requirement that any piece of property depicted in the plans and specifications, even if otherwise considered a trade fixture, equipment, or other personal property, would be an Improvement. For example, appellees presented summary-judgment evidence that the plans and specifications also included depictions of El Chico's walk-in coolers, freezers, tables and chairs, and other trade fixtures or restaurant equipment. If, as Henna argues, paragraph 5 means that all property depicted in the plans and specifications is an "Improvement" that El Chico could not remove without the landlord's approval, it would conflict with paragraph 12, which grants El Chico the right to "remove all or any part of Tenant's equipment,

---

[2] "Pursuant to" is defined as "in conformance to or agreement with" or "according to." *Webster's Third New International Dictionary* 1848 (1986).

15

removable fixtures, signs . . . and other personal property from the Premises, provided that Tenant repairs all damage to the Improvements caused by such removal." We must instead construe these provisions in relation to one another so as to give both effect. *See Valence Operating Co.*, 164 S.W.3d at 662. Consequently, we cannot conclude that the drafters intended paragraph 5 to mean that all property depicted in the plans and specifications is "Improvements" that El Chico could not remove and that the landlord would own after the lease expired. In short, paragraph 5 does not mean that the HVAC units are "Improvements" under the ground lease.

We are similarly unpersuaded by Henna's argument that the HVAC units cannot be trade fixtures because the drafters anticipated at the inception of the ground lease that El Chico would install such units when constructing the restaurant building. Henna is correct that the reported Texas cases holding that air-conditioning units are trade fixtures have involved units that a tenant installed in a preexisting building during a lease term—not, as here, a ground lease where the parties contemplated that the tenant would construct a building and install the units. *See Boyett*, 746 S.W.2d at 27-28; *White*, 299 S.W.2d at 190-92; *Moskowitz*, 178 S.W.2d at 879-80. Although Henna is correct as a factual matter, we disagree that the legal principle governing these decisions turns solely on whether or when the tenant and/or landlord anticipated that the units would be installed. The critical issue, rather, is whether the parties intended the air-conditioning units to be permanent additions to the building, for the landlord's ownership and benefit as part of the realty, or temporary additions to aid the tenant, El Chico, while it was operating a restaurant in the building. *See Jim Walter Window Components*, 642 S.W.2d at 5 (quoting *Menger*, 28 S.W. at 823). We ascertain such intent, as Henna has acknowledged, from the terms of the ground lease. *Id.* at 4 ("The intent of the

16

parties regarding the right to remove additions at the termination of a lease is to be determined from the provisions of the lease agreement."); *see Tempo Tamers, Inc.*, 715 S.W.2d at 664.

The drafters' use of "trade or business fixtures" in paragraph 12 of the ground lease, as discussed, manifests their intent to incorporate the commonly understood meaning of trade fixtures under Texas law. Paragraph 5 of the lease does not reflect a contrary intent, nor do paragraphs 6 and 30, the other provisions on which Henna relies. As appellees observe, Henna's arguments concerning the restaurant's certificate of occupancy are simply inapposite. The fact that El Chico submitted the plans and specifications to the City of Round Rock when obtaining a certificate of occupancy permitting it to operate a restaurant in the building has no bearing on whether the drafters intended the HVAC units or other property depicted in the plans and specifications to be "Improvements" or trade fixtures.

Appellees conclusively established that the HVAC units are trade fixtures under the established definition of that term in Texas law. Paragraph 12 explicitly excludes "trade or business fixtures" from the "Premises" and, thus, the "Improvements" under the lease. In other words, the ground lease unambiguously manifests the drafters' intent that the HVAC units El Chico was to install on the building would be temporary additions to the realty to aid El Chico in operating a restaurant there, which El Chico would continue to own at the lease's conclusion, and not "Improvements" that it was required to maintain or repair for the landlord's benefit. We are bound to give effect to this unambiguous language as the controlling indicator of the bargain the drafters intended to strike. *See Willis*, 199 S.W.3d at 275; *J.M. Davidson, Inc.*, 128 S.W.3d at 229.

17

In a final argument, Henna asserts that El Chico "didn't consider the HVAC system a fixture" in its June 2006 sale of "all furniture, fixtures and equipment" to Henna because the HVAC units did not appear in the list of property attached to the bill of sale. Henna suggests this evidence raises an inference that, as late as June 2006, El Chico intended or understood that the HVAC units were not trade fixtures. We disagree. First, even assuming that "fixtures" as used in the bill of sale would have included trade fixtures, the record does not support Henna's factual premise that El Chico excluded the HVAC units from that category of property—the bill of sale explicitly covers "all furniture, fixtures and equipment, whether or not listed in Exhibit 'A.'" Second, and more importantly, even if this evidence supported an inference as to El Chico's subjective intent or understanding regarding whether the HVAC units were trade fixtures, it would be incompetent to raise a fact issue as to the parties' intent in the face of the unambiguous ground lease. *See Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 32 (Tex. 1958) (parol-evidence rule is a limitation of substantive contract law and not merely a rule of evidence).

Henna's breach-of-contract claims are predicated on the legal conclusion that the HVAC units were "Improvements" under the ground lease. Because the HVAC units were not "Improvements" as a matter of law, the district court properly granted summary judgment for appellees on the ground that Henna cannot prove breach. Accordingly, we overrule Henna's fifth point of error and its corresponding first point of error.

Because this ground alone is sufficient to support summary judgment, *see S.S.*, 858 S.W.2d at 380, we need not reach Henna's contentions regarding other grounds and elements. *See* Tex. R. App. P. 47.1.

18

**CONCLUSION**

We affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   August 27, 2009