

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00011-CV

_____


JAMES J. AND JENEANE CREMERS D/B/A
JUMPIN' JACK'S PARTY SHACK, Appellants

V.

MORRIS L. HALLMAN, Appellee


On Appeal from the 241st District Court
Smith County, Texas
Trial Court No. 11-0429-C


Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

## OPINION

This case arose from a dispute over the actions of lessees, Jim and Jeneane Cremers, in their removal at the termination of a lease agreement of certain trade fixtures or improvements from the property leased by them from Morris L. Hallman. The trial court ruled that a proper construction of the lease agreement allowed Hallman to recover damages from the Cremers. We determine that the trial court's ruling was in error and that Hallman (who ultimately relied solely on the construction of the lease agreement and alleged breach of that contractual lease for recovery and on no other causes of action) should recover nothing from the Cremers. Therefore, we reverse the judgment of the trial court and render a take-nothing judgment.

## I.     Factual and Procedural Background

In 2006, the Cremers formed Jumpin' Jack's Party Shack, Inc., in anticipation of opening a children's party center. Toward that end, they (individually) leased a warehouse located in Tyler[1] from Hallman. The lease, as negotiated, had a four-year primary term expiring August 2010 and provided for a right of first refusal should Hallman determine to sell the realty.

The leased premises included a twenty foot by twenty foot sheet metal over steel frame air conditioned office with an attached fifty foot by eighty foot warehouse structure, made of the same material. This larger un-airconditioned portion of the building had a bare concrete floor and an open-air roof extension that had previously been used as a car wash bay. Each of the attached two structures rested on a concrete slab and each had a walled-off bathroom. The

---

[1]Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We are unaware of any conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

property required significant post-lease build-out in order to accommodate the party center business contemplated by the Cremers.

The Cremers expended $36,950.00 on the necessary dirt work, concrete, and materials in making a fifty foot by fifty foot extension to the larger metal building and enclosing the open-air wash bay. In addition, they installed six air conditioning units with accompanying HVAC duct work[2] and added lighting, plumbing, commercial grade toilets, cabinetry, party rooms, and offices, all of which were needed to run the business.[3] The total cost of all of the improvements (which Hallman was aware were to be used in furtherance of the Cremers' business) was $152,000.00.

There was no exercise of the right of first refusal option and, because the Cremers were unable to secure another place for their business before termination of the primary term of the lease, the parties agreed to extend the lease through December 2010. Although the original lease contained a provision that Hallman would reimburse the Cremers for a portion of the expenditures incurred by them in enlarging the building should they purchase the property, the agreement extending the lease specifically struck that portion of the contract.

In December 2010, upon the termination of the lease agreement as extended, the Cremers vacated the property. When they relinquished possession of the premises, they had removed the

---

[2]After the extension was completed, the building was one homogenous structure. The record does not clearly indicate whether the six new air conditioning units serviced the original structure, as well as the new addition. It appears, however, that at least one or more of the units serviced the original structure, "because the single air conditioning unit existing on the Property at the time [the lease was signed] was attached to the building's lobby and was not capable of cooling the building [] needed for [the] business."

[3]The record does not indicate whether these improvements were made to the existing building as well as the new addition.

3

six air conditioning units, the HVAC duct work, lighting fixtures, kitchen and bathroom fixtures,[4] doors, door jambs, insulation, electrical wiring, and sheetrock from the property, all of which had been installed by them after their entry into the lease agreement.[5] The Cremers removed neither the air conditioning unit that was already in the smaller part of the building at the time it was leased nor any of the things that had been attached to the building when they had first taken possession. Likewise, they did not disturb the extension they had constructed to the building or alter the enclosure they had made of the wash bay. Hallman brought suit against the Cremers.

In response to Hallman's lawsuit alleging harm resulting from the Cremers' removal of the aforementioned items constituted a breach of the commercial lease,[6] the Cremers filed a counterclaim seeking a declaratory judgment that they "owned tenant improvements and tenant-provided fixtures placed in and about the leased premises . . . ." Thereafter, both parties filed competing cross-motions for partial summary judgment. The trial court denied the Cremers' motion for partial summary judgment and granted Hallman's competing motion for partial summary judgment. That order made the following specific finding:

> In the written lease between Morris L. Hallman, lessor, and James J. and Jeneane Cremers, lessees, the parties expressly agreed that at the expiration of the lease, improvements to the property made by lessees, including the building expansion, electrical wiring, plumbing and plumbing fixtures, heating/air conditioning ducts

---

[4]The plumbing was cut and capped off, and toilets and sinks were removed.

[5]All of the air conditioning units, all of the plumbing fixtures, all or most of the doors and door jambs, and the majority of the insulation was reused at the party center's new location; most of the sheetrock, air ducting, and electrical wiring was thrown away.

[6]Hallman also sued for conversion, theft, malicious destruction, and vandalism. These claims were later withdrawn in the parties' Rule 263 stipulated statement of facts. *See* TEX. R. CIV. P. 263.

4

and systems, lighting fixtures, walls, including but not limited to exterior sheet metal and interior sheetrock, insulation, doors and door jambs belonged to lessor, Morris L. Hallman, and were to be returned to the lessor by the lessees in good operating condition.

In addition to that finding, the order also recited that

the building expansion including but not limited to electrical wiring, plumbing and plumbing fixtures, heating/air conditioning ducts and systems, lighting fixtures, walls, including but not limited to exterior sheet metal and interior sheetrock, insulation, doors and door jambs had become so annexed to the realty as to become part of the realty and therefore belonged to the lessor, Morris L. Hallman, at the expiration of the lease.

Following the issuance of the summary judgment order, the parties submitted all remaining fact issues to the trial court in accord with Rule 263 of the Texas Rules of Civil Procedure, in the form of a stipulated statement of facts. TEX. R. CIV. P. 263.[7] The trial court's

---

[7]Rule 263 provides:

Parties may submit matters in controversy to the court upon an agreed statement of facts filed with the clerk, upon which judgment shall be rendered as in other cases; and such agreed statement signed and certified by the court to be correct and the judgment rendered thereon shall constitute the record of the cause.

TEX. R. CIV. P. 263. The parties' Rule 263 stipulations were premised on the trial court's summary judgment ruling, incorporated (as disputed) all facts and arguments from the competing cross-motions for partial summary judgment and related filings, and reserved the Cremers' right to appeal the court's ruling. The parties stipulated that:

a.    The lease agreement between The Parties expired on December 31, 2010.

b.    Defendants . . . did not return the improvements to the property made by lessees . . . to Plaintiff, Morris Hallman, in good operating condition at the expiration of the lease as required by the lease agreement as declared by the Court.

c.    The sum of money if paid now in cash which would fairly and reasonably compensate Plaintiff, Morris Hallman, for his damages, if any, that resulted from the failure of the Defendants, James J. and Jeneane Cremers, to return said improvements to Plaintiff, Morris Hallman, in good operating condition at the expiration of the lease term as required by the lease agreement as declared by the Court are as follows:

    i)    The reasonable and necessary cost to repair and restore said improvements to good operating condition was $62,839.10; and

5

final judgment found that the Cremers breached the lease agreement and awarded Hallman actual damages jointly and severally against the Cremers in the amount of $67,339.10.  In addition, the trial court awarded attorney's fees to Hallman in accord with the parties' Rule 263 stipulations.[8]

On appeal, the Cremers contend (1) the trial court erred in determining that the provisions of the lease contract gave Hallman the improvements and trade fixtures paid for and installed by the Cremers, (2) the trial court erred in holding the Cremers liable for damages in their individual capacities, and (3) the trial court erred in failing to grant their motion for partial summary judgment.

## II.    Standard of Review

Here, the final judgment was based on the trial court's grant of Hallman's motion for partial summary judgment, denial of the Cremers' motion for partial summary judgment, and an

---

    ii)      The loss of rent for the period of time reasonably required to repair and restore said improvements to good operating condition was $4,500.00.

   d.      The reasonable fee for the necessary services of Roger W. Anderson, Esq., Plaintiff, Morris Hallman's attorney for prosecution of his claims for breach of contract are as follows:

    i)      For representation in the trial court, $27,528.75;

    ii)      For successful representation through appeal to the Court of Appeals, $20,000.00; and

    iii)      For successful representation through appeal to the Supreme Court of Texas, $30,000.00.

The parties requested the trial court to enter judgment on the issues of (1) whether the Cremers breached the lease agreement as declared by the trial court in its order of October 26, 2012, (2) whether, and to what extent, if any, Hallman suffered damages as a result, and (3) whether and to what extent, if any, Hallman should recover his attorney's fees from the Cremers.

[8]Prejudgment interest in the amount of $6,412.52 was awarded as well as costs of court incurred by Hallman.

agreed stipulation of the remaining issues to the trial court pursuant to Rule 263. *See id.* The judgment incorporated the Rule 263 stipulations, both motions for partial summary judgment and related filings, and the trial court's order on those motions.

A traditional motion for summary judgment is granted only when the movant establishes there are no genuine issues of material fact and it is entitled to judgment as a matter of law. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). An appellate court reviews de novo the grant or denial of a motion for summary judgment. *Id*. Where (as here) both parties file cross-motions for partial summary judgment, and the court grants one and overrules the other, the appellate court has jurisdiction to review both the grant and the denial. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007). Thus, in this case, we are to review the summary judgment evidence presented by each party, determine all questions presented, and render judgment as the trial court should have rendered. *Id*.; *Comm'rs Court of Titus Cnty. v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997); *Nash v. Beckett*, 365 S.W.3d 131, 136 (Tex. App.—Texarkana 2012, pet. denied).

Additionally, when parties to a lawsuit submit matters in controversy upon stipulated facts, the only issue is whether the trial court properly applied the law to the agreed facts. *Cent. Mut. Ins. Co. v. KPE Firstplace Land, LLC*, 271 S.W.3d 454, 458 (Tex. App.—Tyler 2008, no pet.). We review de novo the issue of whether the trial court correctly applied the law to the admitted facts. *Id*. Because the trial court has no factual issues to resolve when it decides a case on stipulated facts, we indulge no presumption in favor of the judgment. *Otis Elevator Co. v. Parmelee*, 850 S.W.2d 179, 181 (Tex. 1993).

7

### III.    Analysis

This case involves the issue of whether the Cremers breached their commercial lease agreement with Hallman by removing certain improvements and/or trade fixtures from the demised premises at the conclusion of the lease. Because the trial court centered its judgment on defining the term "trade fixture" and the parties have devoted a substantial amount of effort in arguing its application here, we include a discussion of this term. However, as we explain more fully below, because the outcome of this case does not hinge upon that definition but, rather, on the genre of relief ultimately sought by Hallman, the definition of "trade fixture" is not entirely dispositive here.

A "trade fixture" is an article attached to the leasehold by a tenant which enables him to carry on the trade, profession, or business which is contemplated by the lease, and it must be removable without permanent or material injury to the premises. *Connelly v. Art & Gary*, *Inc.*, 630 S.W.2d 514, 515 (Tex. App.—Corpus Christi 1982, writ ref'd n.r.e.). As a general rule, on termination of a lease, trade fixtures are presumed to be the tenant's property and are thus removable by the tenant. *Alexander v. Cooper*, 843 S.W.2d 644, 646 (Tex. App.—Corpus Christi 1992, no pet.). However, this general rule is subject to contractual provisions to the contrary. *Id.*; *Boyett v. Boegner*, 746 S.W.2d 25, 27–28 (Tex. App.—Houston [1st Dist.] 1988, no writ). Accordingly, when the lease specifically addresses fixtures, the lease agreement governs the parties' property rights in the fixtures. *Ashford.Com*, *Inc. v. Crescent Real Estate Funding III*, *L.P.*, No. 14–04–00605–CV, 2005 WL 2787014, at *9 (Tex. App.—Houston [14th

8

Dist.] Oct. 27, 2005, no pet.) (mem. op.); *see Alexander*, 843 S.W.2d at 646; *Fenlon v. Jaffe*, 553 S.W.2d 422, 429 (Tex. Civ. App.—Tyler 1977, writ ref'd n.r.e.).

Hallman claims the lease specifically addresses the parties' intentions regarding improvements and trade fixtures, and he claims that this supports his position as to ownership. Conversely, the Cremers contend the lease provisions do not specifically address the issue of the post-lease ownership of the improvements and trade fixtures. Because both parties contend that the language of the lease supports their respective positions, we must first answer the question of whether the lease contract is ambiguous in regard to that question. This is a question of law which we review de novo. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000); *Cammack the Cook, L.L.C. v. Eastburn*, 296 S.W.3d 884, 891 (Tex. App.—Texarkana 2009, pet. denied). If the lease provision can be given a certain or definite meaning or interpretation, it is not ambiguous. *Lopez*, 22 S.W.3d at 861. If the lease does not specifically address property rights in trade fixtures and improvements, Texas law controls as it pertains to such fixtures and improvements. *Ashford.Com*, 2005 WL 2787014, at *9; *Boyett*, 746 S.W.2.d at 27–28.

> *(1)     The Lease Does Not Specifically Address Ownership of Improvements or Trade Fixtures*

The final judgment includes a finding that the written lease includes an express agreement that all improvements[9] to the property made by the Creamers were to belong to

---

[9]The judgment uses the term improvements to describe the building expansion as well as "electrical wiring, plumbing and plumbing fixtures, heating/air conditioning ducts and systems, lighting fixtures, walls, including but not limited to exterior sheet metal and interior sheet rock, insulation, doors and door jambs."

Hallman at the expiration of the lease. Hallman contends that two paragraphs of the written

lease support this conclusion, including paragraph four of the lease, which provides:

> **Care and Maintenance of Premises.** Lessee acknowledges that the demised premises is [sic] in good order and repair, unless otherwise indicated herein. Lessee shall, at his own expense and at all times, maintain the demised premises in good and safe condition, including plate glass, electrical wiring, plumbing and heating installations and any other system or equipment upon the demised premises, and shall surrender the same, at termination hereof, in as good condition as received, normal wear and tear excepted. Lessee shall be responsible for repairs required, excepting major maintenance and repair of the demised premises, not due to Lessee's misuse, waste, or neglect or that of his/her employees or visitors, which shall be the responsibility of Lessor. The roof, exterior walls, structural foundations, structural components, plumbing systems, drainage systems, electrical systems, ballast and lamp replacement, mechanical systems and HVAC systems which existed PRIOR to July 1, 2006 shall be maintained and repaired by Lessor. Any of these systems which are modified, replaced, or added by Lessee after July 1, 2006 shall be maintained and repaired by Lessee during the term of the lease. Lessee shall also maintain in good condition such portions adjacent to the demised premises, such as sidewalks, driveways, lawns and shrubbery, which would otherwise be required to be maintained by Lessor. Lessee shall be responsible for damage caused to the demised premises by Lessee's negligence and that of Lessee's employees and visitors. Lessee will be responsible for replacing light bulbs both inside and outside of premises.

Hallman contends the term "demised premises" is defined in the lease as the entire property,

which he maintains would include the building expansion and all the improvements thereto.[10]

Hallman's argument is based on the premise that because paragraph four distinguishes between

---

[10]The first paragraph of the lease states, "Lessee hereby offers to lease from Lessor the premises situated in the City of Tyler, County of Smith, State of Texas, described as 125 FM 346 E, Tyler, TX 75703 (and hereinafter referred to as the demised premises) . . . ." Hallman contends that the term "demised premises," as defined in the lease, includes the entire property which, therefore, includes the building expansion. Hallman further contends the Cremers concede this point. While the Cremers might concede the accuracy of the definition of "demised premises," nowhere in the record do they concede that the building expansion is a part of the demised premises for purposes of Hallman's alleged ownership of the expansion and the fixtures within the expansion. The term "demised premises" is merely a defined term referring to the precise location of the property the Cremers were leasing.

10

improvements in existence at the time the lease was executed and "systems which are modified, replaced, or added by Lessee after July 1, 2006," the parties distinguished between the whole, and those systems which might later be added, modified, or improved. Following this line of reasoning, Hallman argues that this provision does not limit surrender of the premises to the original structures. Instead, he posits, the surrender provision was intended to include all new additions and modifications, all being a part of the "demised premises."

This provision is not ambiguous. Moreover, it neither expressly nor impliedly vests Hallman with ownership of tenant improvements. Paragraph four lists a number of items that existed on the demised premises when the lease was executed and it requires the Cremers to "surrender *the same*, at termination hereof, in as good condition *as received*." (Emphasis added.) The remainder of this paragraph addresses the care and maintenance of existing items and newly added or modified items, but does not obligate the Cremers to surrender such improvements and modifications at the termination of the lease. The explicit prescription that the premises must be returned to Hallman in "as good condition as received" means they are to return what they received, not what they might later have added to the premises.

This provision reinforces a clear demarcation between the major components, or systems, of the landlord's property and the tenant's property by requiring Hallman to maintain only those systems identified in the lease as being in existence prior to the commencement of the lease. Conversely, the Cremers were to maintain those systems "added by Lessee after July 1, 2006." The only inference to be drawn therefrom is that the party responsible for the care and maintenance of a building system was the party who installed that system. This provision of the

11

lease does not support the trial court's conclusion that "the parties expressly agreed that at the expiration of the lease, improvements to the property made by lessees . . . belonged to lessor, Morris L. Hallman . . . ."

Hallman also relies on paragraph twenty-eight in support of his contention that the trial court was correct in finding an express agreement between the parties that all improvements to the property belonged to him. Paragraph twenty-eight provides,

> **Other Terms:** Lessee shall have Right of First Refusal if Lessor decides to sell the property at the end of the lease term. The selling price of the property will be determined by independent appraisal. Lessor and Lessee shall each obtain their own appraisal of the property. Lessor agrees to reimburse Lessee 50%, up to a maximum of $25,000, for all monies spent on the concrete and dirt work for expansion, building expansion, and/or HVAC. This money is to be paid by Lessor to Lessee at the end of the lease or upon agreed purchase of property.

Hallman claims that this provision recognizes that improvements to the demised premises would increase its value. Because of this recognized anticipated enhancement in value, Hallman agreed to reimburse the Cremers up to $25,000.00 at the time of sale or at the expiration of the lease. Hallman maintains that if the Cremers were at liberty to destroy or remove the building expansion and improvements, there would have been no reason to have paid them $25,000.00 at the expiration of the lease.[11]

---

[11]We note, however, that no money was paid at the conclusion of the lease. Paragraph twenty-eight was deleted from the lease in its entirety in June 2010. In a letter outlining two different scenarios regarding an extension or renegotiation of the lease, paragraph twenty-eight was to be deleted in its entirety. The Cremers agreed to "waive the $25,000 reimbursement payment and we also waive the Right of First Refusal on the property" in exchange for a four-month extension of the lease. The Cremers contend that the deletion of this paragraph obviates any argument Hallman may have that the lease expressly vests him with ownership in the building expansion and trade fixtures. Because we find that paragraph twenty-eight does not address such ownership, we need not address this issue.

The Cremers further rely on *Eckstine v. Webb Walker Jewelry Co.*, 178 S.W.2d 352 (Tex. Civ. App.—Fort Worth 1944, writ ref'd w.o.m.). The lease in *Eckstine* provided, in pertinent part,

12

This provision is neither ambiguous nor does it expressly provide that Hallman owns all improvements and trade fixtures added to the property.[12]  It merely provides that Hallman is to pay the Cremers no more than $25,000.00 at the conclusion of the lease "for all monies spent on concrete and dirt work for expansion, building expansion, and/or HVAC" or in the event of a sale of the property.  Our primary concern in construing any contract is to ascertain and give effect to the intentions the parties have objectively manifested in the instrument.  *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005) (per curiam).  That intent is governed by what the parties said—not by what they intended to say, but did not.  *C.W. 100 Louis Henna, Ltd. v. El Chico Rests. of Tex., L.P.*, 295 S.W.3d 748 (Tex. App.—Austin 2009, no pet.).  Contract terms are given their plain and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense.  *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005).

Here, the parties agreed that Hallman would pay the Cremers up to $25,000.00 "for all monies spent on concrete and dirt work . . . ."  The contemplated concrete and dirt work was "for expansion, building expansion, and/or HVAC."  It is notable that this provision does not say the

> [I]n the event lessor exercises the option to obtain possession of the premises, lessee agrees to, at the option of lessor, sell to lessor all improvements erected at the cost to lessee, less ten per cent. Should lessor not elect to purchase the improvements referred to, lessor hereby grants permission to lessee to remove said improvements without let or hindrance, and waives any claim to title which he, lessor, may have on the improvements.

*Id*. at 533.  The lessor elected not to purchase the improvements at the expiration of the lease.  Therefore, the lessor could not claim the improvements were his property.  *Id*. at 536.  *Eckstine* is not on point because the lease specifically provided an option to the lessor to purchase the improvements under the named conditions.  Here, the lease does not provide such an option.  It merely requires a payment by Hallman of up to $25,000.00 for concrete and dirt work, the ownership of which is not in dispute.

[12]Neither party contends this provision of the lease is ambiguous.

money was to be paid for the building expansion and trade fixtures (which are categorically different from concrete and dirt work). An unambiguous agreement is to be enforced by the courts as it is written. *Thedford Crossing*, *L.P. v. Tyler Rose Nursery*, *Inc*., 306 S.W.3d 860, 867 (Tex. App.—Tyler 2010, pet. denied). Indeed, extensive concrete and dirt work was performed in order to expand the building. There is no dispute that all such concrete and dirt work performed by the Cremers improved the property and was not disturbed when they vacated the premises.[13]

Because paragraph twenty-eight does not specifically address ownership of the building expansion and trade fixtures, it does not support the trial court's conclusion that "the parties expressly agreed that at the expiration of the lease, improvements to the property made by lessees . . . belonged to lessor, Morris L. Hallman . . . ."

### (2)     No Breach of the Lease Agreement

The parties brief (rather extensively) issues pertaining to the trade fixture status of the building extension and the internal build-out within the extension, including the commercial grade toilets, light fixtures, sinks, cabinets, doors, door jambs, walls, sheetrock, insulation, electrical wiring, and six air conditioners. Because the trial court's judgment found only a breach of contract, we need only determine the propriety of that conclusion. The trial court found:

---

[13]Hallman contends the facts here are almost identical to those in *Haverfield Co. v. Siegel*, 366 S.W.2d 790 (Tex. Civ. App.—San Antonio 1963, writ ref'd). In that case, the lease included a provision whereby the lessor agreed to pay for the cost of improvements subject to a formula and to retain same upon termination of the lease. *Haverfield* is not on point because the lease in that case specifically provided, "'Upon such payment the fixtures and floor covering, excepting trade fixtures, shall become the property of the Lessor and nothing shall be removed that will mar, damage or change the fixtures.'" *Id*. at 791. Here, the lease did not specifically address ownership of any improvements made by the Cremers to the leased premises.

> Defendants, James J. and Jeneane Cremers, did not return the aforementioned improvements to the Plaintff, Morris Hallman, in good operating condition at the expiration of the lease term and thereby failed to comply with the lease agreement as declared by the court.

The court's summary judgment order (incorporated into the final judgment) found that (1) "the parties expressly agreed that at the expiration of the lease, improvements to the property made by lessees . . . belonged to the lessor . . . and were to be returned to the lessor . . . in good operating condition" and (2) "the building expansion . . . bec[a]me so annexed to the realty as to become part of the realty and therefore belong to lessor."

Hallman's initial claims were for breach of contract, conversion, theft, and malicious destruction and vandalism of his property. Vitally important to this ruling, we note that the parties' Rule 263 stipulations provide that Hallman "hereby withdraws his causes of action for conversion, theft, malicious destruction and vandalism of Plaintiff's property by Defendants . . . ." This had the effect of restricting Hallman's claims to damages for breach of contract. The trial court's finding on annexation was superfluous to the final judgment—even though incorporated within that judgment—because the final judgment was based solely on the breach of contract claim. The annexation finding was relevant only to Hallman's now defunct tort claims. That is, even if the annexation finding was correct and everything the Cremers added to the leased premises belonged to Hallman because they are either permanent improvements or fixtures (as opposed to trade fixtures), such determination has no bearing on Hallman's breach of contract claim. Because the only live claim at the time of the final judgment was that of breach of contract, it is under this theory alone that the Cremers could have been held liable to Hallman for allegedly removing improvements and/or fixtures from the leased premises. Stated

15

differently, the trial court's determination that the Cremers breached the contract was based solely on the alleged express agreement that all improvements made by the Cremers on the leased premises belonged to Hallman upon expiration of the lease.[14]  Because the issue of ownership of improvements to the leased premises has no bearing on the outcome of this appeal, we need not consider it.  *See* TEX. R. APP. P. 47.1.

The final summary judgment order (incorporated in the final judgment) found that by entry into the lease agreement, the parties expressly agreed that Hallman would own, at the termination of the lease, all improvements made to the property by the Cremers.  The trial court therefore found that because the Cremers did not return the "improvements" to Hallman in good operating condition at the expiration of the lease term, they "failed to comply with the lease agreement as declared by the Court."  Contrary to that holding, in order to establish a breach of contract claim, Hallman had to show that the Cremers breached an actual provision of the lease. *See Acad. of Skills & Knowledge*, *Inc. v. Charter Schs*., *USA*, *Inc*., 260 S.W.3d 529, 536 (Tex. App.—Tyler 2008, pet. denied).  As previously discussed, the trial court's interpretation of the lease agreement was incorrect.  The lease did not expressly address ownership of improvements, fixtures, or trade fixtures and did not require the Cremers to return any improvements, fixtures, or trade fixtures to Hallman at the expiration of the lease.

---

[14]The parties' stipulations requested the trial court to enter judgment on the following remaining matters in controversy:  (1) whether the Cremers breached the lease agreement as declared by the Court in its Order of October 26, 2012 (finding express agreement that all improvements made by the Cremers on the leased premises belonged to Hallman on the expiration of the lease term), (2) whether, and to what extent, if any, Hallman suffered damages thereby, and (3) whether, and to what extent, if any, Hallman should recover from the Cremers reasonable and necessary attorney's fees.

Proof of breach is an essential element of a breach of contract cause of action. *See Goss v. Bobby D. Assocs.*, 94 S.W.3d 65, 68 (Tex. App.—Tyler 2002, no pet.) (elements of breach of contract are existence of valid contract, performance by plaintiff, breach of the contract by defendant, and damages). Since, as a matter of law, the lease does not vest Hallman with ownership of the improvements and fixtures added by the Cremers and does not require the Cremers to return these items to Hallman upon expiration of the lease, the Cremers' removal of such property cannot constitute a breach of the lease. *See Jim Walter Window Components v. Turnpike Distribution Ctr.*, 642 S.W.2d 3, 6 (Tex. App.—Dallas 1982, writ ref'd n.r.e.) ("Because we hold that Walter was within its rights in seeking to remove the trade fixtures, no 'breach or default' of the lease agreement has occurred."). Because there was no proof of breach presented in the trial court, Hallman could not prevail on his breach of contract claim. *See Goss*, 94 S.W.3d at 68.

The trial court, therefore, erred in determining that the Cremers breached the lease agreement. Damages awarded in the final judgment were based solely on Hallman's breach of contract claim.[15] Other previously asserted claims (including conversion) were voluntarily dropped by Hallman. Because the final judgment made no finding of conversion or for damages

---

[15]The parties stipulated that

> [T]he sum of money if paid now in cash which would fairly and reasonably compensate Plaintiff, Morris Hallman, for his damages, if any, that resulted from the failure of Defendants, James J. and Jeneane Cremers, to return said improvements to Plaintiff, Morris Hallman, in good operating condition at the expiration of the lease term as required by the lease agreement *as declared by the Court* are as follows:
>
> i)      The reasonable and necessary cost to repair and restore said improvements to good operating condition was $62,839.10 . . . .

(Emphasis added.)

17

occasioned by that cause of action (or any of the other tort claims previously asserted), Hallman is not entitled to damages awarded for the "necessary cost to repair and restore said improvements to good operating condition" based solely on the contract claim. Likewise, because the damages awarded for loss of rent and attorney's fees were based solely on the breach of contract claim, they cannot be sustained.

Because the evidence does not support a finding that the Cremers breached the lease agreement, we reverse the judgment of the trial court in its entirety.[16]

(3)     *The Trial Court Erred in Refusing to Grant the Cremers' Motion for Partial Summary Judgment*

The Cremers moved for partial summary judgment on their counterclaim for declaratory judgment,[17] asking the trial court to declare that the lease does not grant Hallman ownership of tenant improvements.[18]   Because the lease does not vest Hallman with ownership of any improvements or trade fixtures added by the Cremers, the trial court erred in refusing to grant the Cremers' motion for partial summary judgment. The Cremers, who had removed the questioned tenant improvements and presumably either had them in their possession or had disposed of them, needed no affirmative relief after a favorable finding except for the recovery of attorney fees. However, their motion for partial summary judgment specifically provided that they were reserving "the issue of attorneys fees under Texas Civil Practices [sic] and Remedies Code

---

[16]The Cremers contend the trial court erred in holding them liable in their individual capacities. Because our determination of the breach of contract claim is controlling, we need not address this issue.

[17]TEX. CIV. PRAC. & REM. CODE ANN. § 37.004 (West 2008).

[18]The motion for partial summary judgment did not address ownership of the improvements and trade fixtures in the absence of a specific lease provision providing for their ownership; we thus do not reach that issue.

18

§ 37.004 and/or § 38.001 for a later motion and/or trial." Even so, no evidence of their attorney's fees was ever presented to the trial court, and the parties' stipulation did not address it. As a result, the trial court could not have awarded attorney's fees to the Cremers. Since no relief could be afforded them (other than the previously requested, but unproven attorney's fees), there is no practical consequence to the failure of the trial court to award judgment to them. In addition, on appeal, the Cremers did not request the relief of the award of trial level costs of court; since they made no such request on appeal, we are unable to award these to them.

## IV. Conclusion

We reverse the judgment of the trial court and render a take-nothing judgment.


Bailey C. Moseley
Justice

Date Submitted:     May 16, 2013
Date Decided:       June 13, 2013

19