# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00668-CV

**Nicole Roberts, Individually and Derivatively on behalf of R Partnership, LLC, Appellant**

**v.**

**Scott Roberts, Individually and Derivatively on behalf of R Partnership, LLC, Appellee**

### FROM THE 419TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-22-004974, THE HONORABLE MAYA GUERRA GAMBLE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an appeal from the trial court's order rendered after a bench trial involving claims between two members of a closely held limited-liability company, R Partnership, LLC (the Company). Pursuant to an earlier agreement between siblings Scott Roberts and Nicole Roberts to wind up the Company, the trial court appointed wind-up supervisors, who sold most of the Company's assets and distributed the funds to Scott and Nicole, holding back $8 million pending judicial resolution of the siblings' claims against each other. Nicole appeals from the trial court's order resolving the parties' "Member Retained Claims" and determining that Nicole should take nothing on her claims and that Scott is entitled to $5.9 million for capital contributions he made to the Company. For the following reasons, we affirm the trial court's order.

# BACKGROUND[1]

Over fifty years ago, Scott and Nicole's parents started a family business owning and operating RV resorts and manufactured-home communities in multiple states. Scott and Nicole formed the Company together in 2013 to continue and grow the family business. They executed an operating agreement (the Operating Agreement) to govern the Company, and things between the siblings and with the business went well for several years, with Scott providing most of the sweat equity while Nicole had invested most of the initial capital. Both were managers and members of the Company, and Scott ran the business with little involvement from Nicole until late 2019. Although Scott kept Nicole informed about the overall business activities, there were no official meetings or manager votes. Nicole never required approval of the Company budgets or expenses; she acted as a self-described "investor who helps" and participated in the Company's business on a project-by-project basis.

The Company was the sole member and 100% owner of three property-owning subsidiaries—Lake Osprey RV Resorts, LLC (Lake Osprey); Kyle Bluebonnet MHC, LLC (Kyle Bluebonnet); and Tyler MHC, LLC (Tyler)—as well as Lakeside Sales, LLC (Lakeside Sales), which was created to sell manufactured homes for the property-owning subsidiaries. The Company owned 99% of the membership interest in Village Basecamp, LLC (Village Basecamp), which the parties formed to purchase and develop property near Lake Tahoe, California, to fulfill their vision of developing an upscale resort there offering RVs, manufactured homes, and luxury park model homes. Early in the Company's history, Nicole

---

[1] Because on appeal Nicole challenges the legal sufficiency of the evidence, we recite the facts in this section in the light most favorable to the order and assume that the trial court resolved disputed facts in favor of its implied findings. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

agreed that Scott's wholly owned company, SBR Management Company, LLC (SBR), would manage the Company's assets and subsidiaries. According to the Operating Agreement, if any manager paid the costs and expenses of operating the Company's property or business, that manager would be entitled to reimbursement therefor, and thus Scott's capital account was credited monthly for SBR's management of Company businesses.

In January 2019, when the Company had the opportunity to purchase the Village Basecamp property, there was competition for it, so the Company purchased it using short-term loans of $10 million each from the siblings' mother and another third party. Scott asked Nicole to supervise the design process for the new park model homes because of her interest and experience in design. The siblings did not take a formal vote before making the Village Basecamp purchase or obtaining the loans on behalf of the Company. Nicole chose Dvele Homes (Dvele) to build the model homes. While necessary groundwork was underway to prepare Village Basecamp to support the siblings' vision, the Company borrowed $25 million from Ladder Capital Finance, LLC (Ladder Bank) to repay its short-term loans. Nicole approved the Ladder Bank loan, which had a three-year term and required the Company to meet interim deadlines to start work on the clubhouse and to prepare the lots for the new homes. Scott was the sole guarantor on the Ladder Bank loan.

By April 2020, the Company was experiencing serious cash-flow problems, and things began to sour between the siblings. All of the Company's properties had cash demands, with the most significant constraint being the Ladder Bank loan. Scott asked Nicole to contribute more capital to address the cash-flow issues, and she refused. Although Scott and Nicole had planned to use the Company's line of credit with First Bank to fund the homebuilding project in Village Basecamp, Nicole blocked the Company's access to the line of credit. That

3

summer, Scott pressed Nicole to finalize a contract with Dvele so that construction could begin and Village Basecamp could meet its obligations under the Ladder Bank loan, but Nicole refused to sign the contract, despite her prior communication with Dvele sending her final comments on a contract with it to manufacture homes according to her specifications. Nicole stopped responding to Dvele's communications, and in early fall 2020, Scott took control over the decision-making at Village Basecamp to get the project back on track. He executed a contract with Dvele on behalf of Lakeside Sales to construct the homes at Village Basecamp and another contract in June 2021 to address rising building costs. He signed these contracts to prevent the Company's defaulting on the Ladder Bank loan and to protect the Company's investments in the Village Basecamp and Kyle Bluebonnet projects, which were collateral for the Ladder Bank loan. Over the next couple of years, Scott contributed $4.9 million to the Company to cover its operating expenses, the cost of the Dvele homes, an unexpectedly high tax bill for Village Basecamp, and to finish the last development phase of Lake Osprey.

Meanwhile, in May 2020, Scott informed Nicole of an opportunity to purchase a 24-acre tract (the Kyle Tract), offered for $500,000, adjacent to the Company's Kyle Bluebonnet manufactured-home community. Although Nicole initially agreed that the Company should pursue the purchase of the Kyle Tract, when Scott called a vote of the managers to decide whether to fund the purchase of the property with capital contributions from each sibling, Nicole did not attend the manager vote and refused to submit a ballot. She also refused to approve the contract to purchase the Kyle Tract that Scott executed on the Company's behalf, and she told Scott that she had "concerns with the closing" of the property. After the closing deadline on the Kyle Tract passed, and the Company was unable to close due to lack of funding and Nicole's silence on the matter—despite her attorney's advice that she agree to Scott's request for capital

4

contributions—Scott purchased the Kyle Tract himself through his wholly owned entity, Kyle Manufactured Home Community, LLC.  He reimbursed the Company for the expenses related to investigating the purchase.  At the time of the trial, no development work or operations had begun on the Kyle Tract, which remained raw land.

Because of the difficulties between Scott and Nicole, in late summer 2022 Scott attempted to invoke the Operating Agreement's buy–sell provision after attempting to reach an agreement with Nicole to end their business relationship.  The buy–sell provision provided that either sibling could notify the other in writing of their desire to sell to or purchase from the other their respective membership interest.  The notice was required to specify the sale or purchase price, which had to be the fair market value of the membership interest sought to be sold or bought.  Upon receipt of such an offer, the other sibling was required to either purchase the offeror's membership interest at a price equal to the fair market value multiplied by the percentage interest of the offeree or sell to the offeror his or her membership interest at a price equal to the fair market value multiplied by the offeree's percentage interest.  The buy–sell provision provided further details on the timing and procedures for such sale and purchase.

In September 2022, Scott filed a lawsuit against Nicole to enforce the buy–sell provision and compel her to sell him her membership interest in the Company.  Nicole countersued for fraud, breach of contract, breach of fiduciary duty, indemnification, and to obtain an accounting.  Scott later added claims for breach of contract, breach of fiduciary duty, and tortious interference.  He requested that the court place Nicole's membership interest in limited receivership pending resolution of the lawsuit and declare the amounts of capital contributions he had made to the Company.

5

Trial commenced in June 2023, and during a recess the parties agreed to a judicial winding up of the Company. The trial court signed an order dissolving the Company, appointing as wind-up supervisors (Supervisors) Karen Nicolaou and Greg Milligan, and specifying that the court would set forth the Supervisors' authority by further order and recess the remaining claims in the case pending further order. Shortly thereafter the trial court signed an Agreed Order on Wind Up Supervisors' Authority and Procedures (Agreed Order), which provided broad authorization to the Supervisors with respect to the wind up: "except as expressly limited herein, the Wind Up Supervisors shall have all powers, authorities, rights, and privileges necessary to manage [the Company's] property of any and every kind, whatsoever and wherever located." The Agreed Order limited the Supervisors' powers in one significant way: "the Wind Up Supervisors shall not hold authority to enforce those rights and claims asserted directly or derivatively by or against [the Company's] members, or the members' affiliates and agents, pending with this Court (the 'Member Retained Claims'), which Member Retained Claims are expressly reserved for court resolution." The Agreed Order gave the Supervisors the "sole authority to sell any [Company a]sset, including to direct any process involving the sale of all or substantially all of" its assets and required them to "use reasonable efforts to conclude final distributions by December 31, 2023 . . . , except as to the Member Retained Claims."

In September 2023, the trial court signed an Agreed Order on Wind Up Monetization Plan (Monetization Plan). The Monetization Plan specified how the Supervisors were to liquidate the Company's subsidiaries and their assets. Included in the Monetization Plan was the process for the sale of Village Basecamp, which sale was to include the Dvele homes "already located at Basecamp." The Monetization Plan specified that the sale of the Dvele

6

homes "as part of the sale process is not an admission or waiver by either Nicole Roberts or Scott Roberts regarding any Member Retained Claims . . . involving the Dvele Homes."

Trial to the court on the parties' member-retained claims resumed in July 2024. On September 27, 2024, the trial court rendered the order that is the subject of this appeal: Amended Order on Member Retained Claims (Order). In the Order, the trial court declared the amounts and dates of capital contributions (as defined in the Operating Agreement) that Scott had made, as well as the amount of priority return (10%) that he is entitled to receive beginning on the date he made each contribution.[2] The Order found that Scott had made the following capital contributions on the following dates:

| | |
|---|---|
| $1,000,000 | December 10, 2021 |
| $1,500,000 | February 1, 2022 |
| $124,220 | March 4, 2022 |
| $375,780 | September 18, 2023 |
| $1,966,727.66 | September 18, 2023 |

The Order then provided,

> The Court DENIES the remainder of the parties' Member Retained Claims and ORDERS that the parties take nothing on those claims.
>
> IT IS THEREFORE ORDERED that the Wind Up Supervisors shall distribute to Scott Roberts the amount of $5,895,767.00 for the Capital Contributions listed above and his Preferred Return through September 11, 2024, no later than

---

[2] The Operating Agreement authorizes the managers to make periodic distributions when it has an excess of cash on hand (as defined), including a 10% priority return that has accrued on the capital contributions of Class A and B Holders and specifies that Nicole is a Class A Holder and Scott is a Class B Holder. It also specifies the priority of distributions to be made upon dissolution and includes the return of capital contributions plus the 10% priority return in that list of distributions after other distributions are made.

October 7, 2024. That interest and the Preferred Return will continue to accrue in the amount of $1,361 per day through that distribution.

Each party will bear its own attorneys' fees and costs.

Nicole perfected an appeal from the Order, and Scott filed a motion to dismiss her appeal, arguing that this Court does not have jurisdiction over Nicole's appeal because the Order is not final and appealable.

## DISCUSSION

*Jurisdictional issue*

We first address the jurisdictional issue raised in Scott's motion to dismiss. Scott contends that because the Order does not include words indicating finality and the trial court has "continued to decide contested matters related to the wind-up" of the Company, it is not a final order that actually disposes of every pending claim and party. *See Patel v. Nations Renovations, LLC*, 661 S.W.3d 151, 154 (Tex. 2023) ("By definition, a final judgment must dispose of all parties and all claims in the underlying case."). Scott cites the trial court's Agreed Order on Distributions of Lake Osprey RV Resort, LLC Inventory Lots signed November 21, 2024—after the Order that is the subject of this appeal—to demonstrate that the Order is not final.[3] He also contends that the following actions related to the windup have yet to occur: the filing of tax returns, a true-up of a closing adjustment for the properties sold to Scott, a final accounting, the

---

[3] As to Lake Osprey, the Monetization Plan specified that the Supervisors were authorized, without further court order, to "continue to market and sell all remaining unsold lot inventory in the ordinary course of business." It appears that by November 21, 2024, several lots in the Lake Osprey resort remained unsold, and thus the agreed November 21 order specified the procedures by which those remaining lots would be disposed, to include a sealed-bid auction between Scott and Nicole, or any entity they appoint, to bid on the lots as well as a default liquidation process should any of the lots not be disposed of through the auction.

8

filing of a certificate of termination with the Texas Secretary of State, and final payments and discharge of the Supervisors and their counsel.

Scott is correct that a judgment or order is final for purposes of appeal if it disposes of all pending parties and claims in the case, *see id.*, and that there are remaining tasks and actions to be taken by the Supervisors. However, if after a judgment disposing of all pending parties and claims is rendered, there are further ministerial tasks for the court to supervise that are necessary to carry out its decree, those tasks do not affect the judgment or order's finality. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001). There is also a presumption that an order or judgment rendered after a conventional trial on the merits, as here, is final for purposes of appeal. *See In re R.R.K.*, 590 S.W.3d 535, 541 (Tex. 2019). Although the presumption can be overcome if an order following a conventional trial on the merits is ambiguous as to its finality, *see id.*, we do not believe the Order is ambiguous because it fully resolves all member-retained claims between the parties, including attorneys' fees. Furthermore, if we had any doubt as to the Order's finality, our review of the record leads us to conclude that the trial court intended the Order to be final. *See id.*; *see also Lehmann*, 39 S.W.3d at 195 ("[W]hether a judicial decree is a final judgment must be determined from the language and the record in the case.").

The Order was rendered after a bench trial on the merits of all the claims remaining pending between the parties after the trial court had already rendered its orders dissolving the Company, appointing the Supervisors, specifying the broad powers and authority of the Supervisors, and approving the parties' agreed Monetization Plan. Although there remained a few ministerial tasks for the Supervisors to perform after the Order was rendered, those tasks constituted "carrying out" the earlier orders rendered by the trial court pertaining to

9

the Company's winding up. *See id.*; *Moody v. State*, 520 S.W.2d 452, 456 (Tex. App.—Austin 1975, writ ref'd n.r.e.) (recognizing long-standing rule that "in some instances [such as receivership] a court of necessity will retain control of a judgment, final on the merits, for further proceedings to carry the judgment into full effect"). Those ministerial tasks—the filing of tax returns, providing accountings, filing of a termination certificate, and making final distributions—do not affect the finality of the Order, as the essential requisite for whether the Order is final is whether it finally disposes of all issues and parties and leaves as "undone only such matters as are necessary to carry the [winding down] into effect." *See Moody*, 520 S.W.2d at 456.

Furthermore, the Agreed Order specifying the Supervisors' powers vested them with the power and authority to handle any disagreements about the dissolution of the Company on their own without further intervention or action by the trial court. Nonetheless, the Supervisors were given "the right (but not the obligation) to bring any disagreement regarding the management, operation or winding up" of the Company "to the Court for resolution" and "may, but are not required, to obtain supplemental or further orders" regarding the disposition of Company assets, the settlement of any disputes or causes of action that constitute Company assets, or their authority and powers. But the Supervisors' ability to seek further court orders, for instance, the agreed order on the Lake Osprey distributions, until they complete their court-ordered duties does not alter the finality of the Order resolving all remaining claims between the parties. All that remained after rendition of the Order was for the trial court to supervise, as necessary, the carrying out of its own prior decree to dissolve the Company. We conclude that the Order is a final, appealable order, and we deny Scott's motion to dismiss.

*Nicole's appellate issues*

Nicole raises three issues on appeal, asserting that the trial court erred in (1) determining that she implicitly waived her right to enforce the Operating Agreement despite its nonwaiver provision; (2) determining that she should take nothing on her breach-of-contract, breach-of-fiduciary-duty, and indemnity claims; and (3) awarding Scott $5.9 million on his member-retained claim for the return of his capital contributions.

When, as here, after a nonjury trial the trial court does not file findings of fact or conclusions of law, we will imply that the trial court made all necessary findings to support the judgment. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992). And we must affirm the judgment on any legal theory that finds support in the evidence. *See Narvaez v. Maldonado*, 127 S.W.3d 313, 319 (Tex. App.—Austin 2004, no pet.). We first consider Nicole's second issue, as we need not consider her first issue to resolve this appeal. *See* Tex. R. App. P. 47.1, 47.4.

*Nicole's member-retained claims*

In her second issue, Nicole argues that the trial court erred in determining that she is not entitled to recover on her claims for (1) breach of contract and breach of fiduciary duty with respect to Scott's purchase of the Kyle Tract and (2) indemnity for the attorneys' fees she incurred in defending against Scott's lawsuit. She argues that she should have recovered on these claims "as a matter of law"—that is, the evidence is legally insufficient to support the trial court's findings against her. As the party with the burden of proof on these claims before the trial court, to prevail on appeal Nicole must demonstrate that the record conclusively establishes all vital facts in support of her claims as a matter of law. *See Shields Ltd. P'ship v. Bradberry*,

11

526 S.W.3d 471, 480 (Tex. 2017). In conducting our legal-sufficiency review, we consider evidence and inferences supporting the trial court's judgment, and we ignore inferences to the contrary. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). As long as the evidence would enable reasonable and fair-minded people to differ in their conclusions, we will not substitute our judgment for that of the factfinder, which is the only judge of witnesses' credibility and the weight to be afforded their testimony. *See id.*

*Breach of contract*

Regarding her breach-of-contract claim, Nicole argues that Scott breached Section 2.9 of the Operating Agreement by competing with the Company when he purchased the Kyle Tract for himself. Section 2.9 provides,

> 2.9 **Other Activities.** Except as provided in this Operating Agreement, the Managers, the Holders and their affiliates, will at all times be free to engage generally, directly or indirectly, in any other business venture of any nature or description, provided, however, any such business or venture may not compete or tend to compete with the Company. The Managers, the Holders and their affiliates have no duty or obligation to present to the Company any investment or business opportunity, which they discover, other than any such investment or business opportunity that may compete or tend to compete with the Company. Neither the Company nor its Holders have any right by virtue of this Operating Agreement in or to such other ventures or businesses, or to the income or profits derived therefrom.

To prevail on her claim, Nicole had to prove the following elements: (1) the existence of a valid contract between the parties; (2) performance (or excuse) by the party asserting the claim; (3) breach of the terms of the contract by the other party; and (4) damages resulting from the breach. *C.W. 100 Louis Henna, Ltd. v. El Chico Rests. of Tex., L.P.*, 295 S.W.3d 748, 752 (Tex. App.—Austin 2009, no pet.). To prevail on appeal, Nicole must demonstrate that the record conclusively establishes each of those elements. *See Shields Ltd.*

12

*P'ship*, 526 S.W.3d at 480. We conclude that she has failed to do so with respect to at least the third element: that Scott breached Section 2.9's prohibition on a manager's engaging in a business or venture that competes or tends to compete with the Company.

The parties urge competing constructions of Paragraph 2.9's restriction on whether or under what conditions a manager may engage in competing ventures. Nicole argues that the provision means a manager may not engage in any venture or business that competes or tends to compete, full stop. Scott contends that the provision means a manager may engage in such venture or business if he first presents the opportunity to the Company and the Company declines to participate in it. However, we need not resolve this dispute about the meaning of the provision because, even assuming that Nicole's construction is correct, we conclude that she has not demonstrated that the evidence conclusively establishes that Scott's acquisition of the Kyle Tract competed or tended to compete with the Company.

Nicole argues that "there's no question that a manufactured home community next door would compete with Kyle Bluebonnet and so with" the Company. Yet she cites no evidence or authority to support this claim. She focuses her attention on portions of the record that she claims demonstrate Scott's "secret" plan to take advantage of the Kyle Tract opportunity for himself rather than allow the Company to take advantage of the "promising opportunity" to develop the Kyle Tract and add fifty to eighty manufactured homes adjacent to the existing Kyle Bluebonnet property. But apart from what Scott's plans may or may not have been to develop the Kyle Tract himself, the evidence shows that at the time of the July 2024 trial, the Kyle Tract remained undeveloped (as raw land), and no lots or homes had been rented or sold on it. Because the Company was dissolved on June 22, 2023, the Kyle Tract was never an actual competitor to the Company, nor does Nicole explain how any evidence demonstrates that Scott's

13

ownership of the Kyle Tract would tend to compete with the Company. We conclude that Nicole did not meet her burden to establish that the trial court erred in granting her no relief on her breach-of-contract claim.

### Breach of fiduciary duty

To prevail on her claim for breach of fiduciary duty, Nicole had to prove the following elements: (1) the existence of a fiduciary duty; (2) breach of the duty; (3) causation; and (4) damages. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). Nicole argues that Scott, as a "corporate fiduciary," had a fiduciary duty not to "usurp corporate opportunities." *See Lifshutz v. Lifshutz*, 199 S.W.3d 9, 18–19 (Tex. App.— San Antonio 2006, pet. denied). She argues that Scott breached his fiduciary duty by usurping the Company's opportunity to develop the Kyle Tract by purchasing it himself, which allegedly cost the Company $7.4 million in lost profits.

Defenses to a corporate-usurpation claim include (1) the company's financial inability to take advantage of a corporate opportunity and (2) its abandonment of a business opportunity, and the burden of proving either defense is on the director who allegedly appropriated the corporate opportunity. *See Landon v. S&H Mktg. Grp., Inc.*, 82 S.W.3d 666, 681 (Tex. App.—Eastland 2022, no pet.). Scott argues that he proved both defenses. As the appellant challenging the trial court's implied adverse finding that Scott met his burden on one or both of these defenses, Nicole must demonstrate that no evidence supports the adverse finding. *See Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014). We conclude that she has not so demonstrated with respect to at least Scott's defense that the Company abandoned the Kyle Tract opportunity.

14

There was evidence that in May 2020, Scott informed Nicole about an opportunity to purchase the Kyle Tract for $500,000. In September 2020, Scott sent Nicole a draft purchase agreement for the Kyle Tract and on March 30, 2021, provided a Notice of Meeting of Members to occur on April 5, 2021, requesting $1 million in contributions ($500,000 from himself and $500,000 from Nicole) to purchase the tract and provide additional working capital for the Company. Scott testified that this was the "only way" to fund the purchase of the tract and that the Company was "nowhere close" to having the "financial abilities" to purchase the tract otherwise, but Nicole did not attend the meeting. She would not approve the purchase, despite her attorney's urging her to reconsider whether to approve the mutual capital funding to close on the purchase, informing her that "it could be a nice asset to potentially enhance Lakeside's value." Her attorney also warned her that Scott would argue that the Company "waived its rights to acquire the property and will then submit his own offer" for the tract if she did not approve the purchase.

On August 10, 2021, Scott's counsel asked Nicole's counsel about discussions with Nicole regarding the Company's capital requirements and informed her counsel that the closing deadline for the Kyle Tract was August 16 and that the Company lacked the capital to acquire or develop the land. Neither Nicole nor her counsel responded to Scott about the Company purchasing the Kyle Tract. On August 16, having heard nothing from Nicole, Scott purchased the Kyle Tract through his own company because, he testified, he could not close on a real-estate transaction on behalf of the Company without Nicole signing the necessary documents. Based on this evidence, the trial court could reasonably have found that the Company abandoned the opportunity to purchase and develop the Kyle Tract. This and other evidence in the record constitutes more than a scintilla to support the trial court's implied finding

15

that Scott established his defense to corporate usurpation, and we accordingly overrule Nicole's argument that legally insufficient evidence supports the trial court's determination that she should take nothing on her breach-of-fiduciary-duty claim.

*Indemnification*

Nicole argues that the trial court erred in denying her indemnification claim, by which she sought to have the Company indemnify her for the attorneys' fees she incurred in defending against Scott's suit. She cites Section 9.1 of the Operating Agreement as support for her indemnity claim. That section provides,

> To the fullest extent permitted by law, *the Company shall indemnify any Member or Manager or agent of the Company* who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company) by reason of the fact that such Member or Manager or agent is or was a Member or Manager or agent of the Company or is or was serving at the request of the Company as an agent, director or officer of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against liability incurred in connection with such action, suit or proceeding, including attorneys' fees, judgments, fines and amounts paid in settlement actually and reasonably incurred by such Member or Manager or agent in connection with such action, suit or proceeding, including any appeal thereof, *if such Member or Manager or agent acted in good faith and in a manner such Manager or agent reasonably believed to be in or not opposed to the best interests of the Company* and, with respect to any criminal action or proceeding, had no reasonable cause to believe such Member or Manager's or agent's conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Member or Manager or agent did not act in good faith and in a manner which such Member or Manager or agent reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had reasonable cause to believe that such Member or Manager's or agent's conduct was unlawful.

(Emphases added.)

16

Scott responds that the indemnity provision does not apply to claims between managers. *See Claybar v. Samson Expl., LLC*, No. 0 9-16-00435-CV, 2018 WL 651258, at *3 (Tex. App.—Beaumont Feb. 1, 2018, pet. denied) (mem. op.) (noting general rule that indemnity provisions do not typically apply to claims between parties to agreement unless parties included specific language in agreement to that effect). Scott further argues that, even if the indemnity provision applies, the provision required Nicole to prove that she acted in good faith in rejecting Scott's efforts to enforce the buy–sell provision and in taking the other actions he challenged by way of his claims, but she did not so prove. We agree with Scott on this latter argument and therefore need not consider his argument that the indemnity provision does not apply; rather, we assume for purposes of reviewing the evidence of whether Nicole acted in good faith that the indemnity provision applies. Nicole argues that "she indisputably acted in good faith as a matter of law," that is, the evidence is legally insufficient to support the trial court's implied finding to the contrary. As the party with the burden of proof on that issue below, Nicole must demonstrate on appeal that the evidence conclusively established that she acted in good faith. *See Shields Ltd. P'ship*, 526 S.W.3d at 480.

The only evidence Nicole cites to support her claim that she acted in good faith when rejecting Scott's August 16, 2022 offer to buy her shares for $25 million is her receipt in April 2024 of $32 million, her share from the Supervisors' sale of most of the Company's assets. She argues this amount is "far more than she would have received had she accepted Scott's" offer and proves that his offer was not for the "fair market value" as required by the buy–sell provision. However, this assertion fails to recognize the passage of time between Scott's offer and the Supervisors' sale; it also does not account for the Supervisors' and broker's considerable amount of work that went into marketing the Company's assets between those dates, which

17

efforts were reflected in the trial court's February 2, 2024 Order on Motion to Approve Asset Sale.[4]   Nor does Nicole support this assertion with any evidence in the record showing that Scott's offer at the time was not for the "fair market value."   Furthermore, Nicole could have opted to purchase the Company from Scott for $25 million, which would have benefited her significantly, evidenced by the Supervisors' sale of most of the Company's assets for $73 million, undermining her assertion that Scott's offer was not for the fair market value.   Yet she chose not to buy Scott's interest.

Also, beyond her rejection of Scott's buy–sell offer for its alleged failure to be set at the fair market value, Nicole does not cite any evidence demonstrating her good faith with respect to the other challenged actions that Scott asserted in this suit: her alleged breach of fiduciary duty and tortious interference with the Company's contracts and business relationships.[5]   Moreover, there is evidence in the record to the contrary, supporting the trial court's implied finding that Nicole did not act in good faith in failing to act on Scott's buy–sell offer and through the other actions and inactions that Scott challenged.   That evidence includes the following actions and inactions by Nicole:

---

[4] The Order on Motion to Approve Asset Sale states, "The Court . . . finds that JLL [the broker] and its professionals provided reasonable and necessary services and contributed significant value to the . . . Supervisors and [the Company] in advancing the sales process."

[5] In his live petition, Scott alleged that Nicole breached her fiduciary duty by unreasonably refusing to take actions in the best interest of the Company, by blocking the Company from capital it needed to comply with its contractual agreements, by providing inaccurate information to the Company's lenders and vendors, by acting out of her own self-interest, by withholding her consent to business opportunities presented to the Company, and by damaging the Company's reputation and goodwill.   He alleged that she willfully and intentionally tortiously interfered with the Company's contracts and business relationships with its employees, consultants, vendors, and lenders to serve her own personal interests at the expense of the Company's interests.

18

- Failing to cooperate with Scott to take advantage of business opportunities for the Company, including the Company's potential purchase of the Kyle Tract by failing to attend meetings, approve mutual capital funding for the purchase, and respond to Scott's communications about the impending closing date on the purchase.

- Interfering in SBR's management of the Company by sending unprofessional and harassing emails to its employees, for instance, demanding that specific actions be taken or that specific employees be removed from various tasks, and stating about Scott— while copying his employees—that "I will make all your actions public so people can see who you really are."

- Informing the Company's contacts at First Bank that Scott was misappropriating Company funds and her capital accounts and then unilaterally freezing the Company's line of credit at the bank so that First Bank was not an option to fund the purchase of the Dvele homes or Kyle Tract.

- Refusing to provide more capital contributions, as she had typically done, to help fund the Company's management of its assets and to prevent the Company from defaulting on the Dvele contract, despite being informed that the Company was experiencing cash-flow issues.

- Assuming marketing and design responsibilities for Village Basecamp and negotiating a contract with Dvele per her specifications but then ceasing to respond to Dvele's communications and failing to sign the contract.

While Nicole disputes the inferences that the trial court reasonably made from such evidence, she does not demonstrate that the only reasonable inference the trial court could have drawn from this and other evidence is that she acted in good faith. And the trial court, as the sole judge of credibility and weight to be afforded the testimony and other evidence, *see City of Keller*, 168 S.W.3d at 822, 827, impliedly resolved the evidence of Nicole's purported good faith against Nicole and in Scott's favor. Because Nicole did not demonstrate that the evidence conclusively establishes she acted in good faith with respect to her challenged actions and inactions for which Scott sued her, we conclude that the trial court did not err in denying Nicole's indemnification claim.

We overrule Nicole's second issue.[6]

### Scott's Capital Contributions

In her third issue, Nicole challenges the trial court's determination of some of the capital contributions that Scott made and for which he is entitled a priority return. The Operating Agreement defines a capital contribution as "any contribution by a Holder of cash, property (whether real or personal), or services to the capital of the Company."[7] Besides the initial and subsequent capital contributions designated in the exhibits attached to the Operating Agreement, the Operating Agreement specifies two circumstances under which additional capital contributions may be made: (1) "By a Special Vote of the Members, the Class A Holders and the Class B Holders may be required from time to time to make additional Capital Contributions," and (2) "If the Company does not have sufficient cash to pay its obligations and subsequent contributions are not required by a Special Vote of the Members . . . any Member may advance all or part of the needed funds to or on behalf of the Company and such advance shall be treated as an additional Capital Contribution."

It is undisputed that the first circumstance—special vote of the members—did not occur with respect to the challenged capital contributions. Rather, in her first argument

---

[6] In her first issue, Nicole argues that the trial court erred in implicitly determining that she waived her right to enforce the Operating Agreement and may not recover on her member-retained claims for that reason. Because the trial court made no express fact findings or legal conclusions, Nicole's non-waiver arguments derive from the parties' legal arguments below and comments the trial court made during trial. However, because we are affirming the trial court's judgment denying Nicole's member-retained claims based on her second issue challenging the legal sufficiency of the evidence, we need not address her first issue. *See Narvaez v. Maldonado*, 127 S.W.3d 313, 319 (Tex. App.—Austin 2004, no pet.) (appellate court must affirm judgment on any legal theory supported by evidence); Tex. R. App. P. 47.1, 47.4.

[7] A "holder" is defined as "any Person who holds a Membership Interest, regardless of whether such Person holds such Membership Interest either as a Member or as an Assignee."

20

contesting the capital contributions, Nicole contends that $3.25 million of the $4.9 million in capital contributions the trial court determined were made by Scott cannot stand because those advances did not meet the Operating Agreement's "narrow exception" specified above in the second circumstance: that the member advanced the funds to the Company or on its behalf to pay the Company's obligations when the Company did not have sufficient cash to do so. She contends that "most of" the $3.25 million was used to pay for the purchase and installation of the Dvele homes but that Scott was not authorized to incur those obligations because she had not consented to the Company's execution of the Dvele contract. She contends that Scott's purported breach of the Operating Agreement through execution of the Dvele contract and the associated payments made thereunder preclude him from claiming those payments as capital contributions.

However, Nicole has not presented substantive arguments or cited authority regarding how or why Scott's purported breach in executing the Dvele contract and making payments thereunder would preclude the amounts he advanced from being characterized as capital contributions under the Operating Agreement's definitions. Once the Dvele contract was executed—properly or improperly—it became an obligation of the Company, and there was evidence of the Company's "serious cash-flow problems," inability to meet its obligations under the Ladder Bank loan, and lack of capital to pay the amounts due under the Dvele contract and that such circumstances were what spurred Scott to inject the capital he did towards the Dvele homes. However, to the extent that Scott's purported breach of the Operating Agreement by executing the Dvele contract without Nicole's consent would preclude him from claiming as a capital contribution the amounts he advanced to purchase the Dvele homes and meet the Company's obligation under that contract, Nicole would have to demonstrate that the evidence

21

conclusively establishes all requisite elements of that breach by Scott, including damages. *See C.W. 100 Louis Henna*, 295 S.W.3d at 752. We conclude that she has not conclusively established at least one element—damages.

The only evidence of damages Nicole cites to support her argument that Scott breached the Operating Agreement through his "unauthorized" execution of the Dvele contract is a brief portion of the testimony of her expert witness, Dwight Duncan, and a spreadsheet he prepared.[8] Duncan testified that the more than $500,000 that Scott spent of Company funds on the set-up, design, and installation of the Dvele homes would have been available "as one source for how to purchase" the Kyle Tract had he not spent those funds, without the "requisite approval," on the Dvele project. But such testimony does not necessitate the inference that those funds were the only source the Company could have used to purchase the Kyle Tract. In fact, Nicole herself testified that the Company "had the liquidity" to close on the Kyle Tract or could have "gotten a line of credit" to purchase the Kyle Tract. Moreover, as we have already discussed, there was evidence that the Company effectively abandoned the Kyle Tract purchase because of Nicole's refusal to participate in discussions about how best to fund it and her non-responsiveness to Scott's communications as the closing date drew near.

---

[8] Nicole also argues that she suffered "straightforward damages from this breach" in the form of the priority return Scott is entitled to receive on the capital contributions the trial court determined he had made. However, she does not cite any evidence in the record identifying which contributions, and in what amounts, were spent on the Dvele homes, merely arguing that "most of" the disputed $3.25 million went towards the Dvele homes. In contrast, Scott cites general ledgers from SBR's management of Village Basecamp supporting the trial court's determination that approximately $2.3 million went towards the Dvele homes. As explained infra, the trial court's affixing to that $2.3 million a contribution date coinciding with the date of the Monetization Plan—when the parties agreed that the Dvele homes belong to the Company—obviates any claim of premature accrual of a priority return because as of that date the Company indisputably received the benefit of Scott's contribution of the homes to the Company.

Regarding Duncan's spreadsheet that Nicole references, it indicates that Village Basecamp suffered a loss of income because the lots were occupied by the Dvele homes rather than being rented as raw land. But the trial court appeared to have discredited Duncan's spreadsheet and testimony about it, as was its province, and conflicting evidence in the form of Scott's testimony demonstrates that the Company received far more in revenue from the installed Dvele homes than it would have from unoccupied lots. For instance, Scott testified that "running this [Basecamp Village property] as a transient RV park, you would never be able to generate enough revenue to be able to satisfy the Ladder [Bank] loan. You had to get the homes installed, you had to get the homes sold, and you had to run the hotel business model to make the business plan work." Furthermore, the evidence showed that the parties' business plan was, indeed, to install the Dvele model homes as a revenue source and that Nicole's initially agreed-to task was to negotiate and execute the contract with Dvele for the manufacture and delivery of the homes. Evidence showed that the Ladder Bank loan required the Company to meet interim deadlines to start work on the clubhouse and to prepare the lots for the new Dvele homes. To meet its obligations under the Ladder Bank loan and prevent default, the homes needed to be built and installed. The trial court could reasonably have found that Scott's expenditure of both his own funds and some of the Company's to install the homes and implement the business plan was necessary to meet the Company's obligations with respect to the Ladder Bank loan, and that execution of the Dvele contract was a requisite step in that endeavor. Nicole has not demonstrated that the evidence conclusively establishes that Scott's execution of the Dvele contract caused the Company damages or precludes him from claiming as capital contributions the advances he made towards that contract.

23

Nicole next argues that some of the money the trial court determined constituted capital contributions by Scott either "didn't come from Scott at all" or "didn't go to [the Company]." Nicole contends that "nearly $2.5 million that the trial court credited to Scott wasn't from him but from other entities he owned" and that the "money didn't go to [the Company] either . . . [but] went straight or through intermediaries to Dvele." She argues that the Operating Agreement "makes plain that only members could make contributions to" the Company. To support this argument, Nicole cites Scott's testimony that (1) as to a challenged $500,000 contribution, that amount went "from SBR's account to Rick Albers' account to Dvele"[9] and (2) as to a challenged $1.97 million contribution, that amount went "straight from VC Sales [Scott's wholly owned entity] to Dvele." But this testimony does not conclusively establish that the funds did not "come from Scott."

One of Scott's spreadsheets, which the trial court admitted into evidence, notes that Scott wired the $500,000 "to SBR to fund Rick Albers Trust Account," supporting the trial court's finding that the contribution came from Scott. Furthermore, in other parts of his testimony, Scott confirmed that he was the source of the challenged advances. As to VC Sales, Scott testified that he established the entity to purchase the Dvele homes and install them at Village Basecamp because it was necessary for the Company to obtain a license to sell manufactured homes in California. The license would need to be issued by the California DMV, and Scott did not initially include Nicole as a principal on the entity-formation documents because he was under stress to execute the business plan before the Company defaulted on the Ladder Bank loan. However, Scott always intended VC Sales to be an "asset" of the Company.

---

[9] Rick Albers is a Company attorney who established an escrow account and acted as a trustee of the funds that Scott deposited into that account. After Albers verified invoices from Dvele, he would release the funds to Dvele.

Scott testified that he at one point assigned the Dvele contract to VC Sales to avoid any complications arising from Nicole asserting that she had not agreed to the contract. After the Dvele homes had been paid for, some of which funding Scott channeled through VC Sales, Scott and VC Sales signed an "Assignment of Rights and Claims" in which they agreed that the "infusions" of capital that VC Sales made towards the Dvele homes would "be treated as a distribution of property from VC Sales to Scott . . . and a concurrent capital contribution of such property by Scott . . . into [the Company] for the benefit of its subsidiary" Village Basecamp. Scott and VC Sales further agreed that VC Sales was thereby "assign[ing] to Scott . . . all legal and equitable interests of VC Sales in and to the VC Sales Infusions." Additionally, Scott testified that the contributions he made to the Company through VC Sales and SBR were not gifts to the Company; he considered them capital contributions. Finally, Supervisor Nicolaou testified that she traced all of the challenged contributions as originating from Scott or one of his wholly owned entities.

On this record, the trial court could reasonably have determined that the challenged advances should be characterized as capital contributions made by Scott. The fact that Scott used his wholly owned entities as conduits through which the contributions flowed from him to the Company does not conclusively establish that Scott did not make the contributions. As to Nicole's argument that the contributions were not made *to* the Company (but were made either directly to Dvele or funneled to Dvele after first being deposited in Albers's trust account), the Operating Agreement expressly allows capital contributions to be advanced either to the Company or "on behalf of" the Company, which is what the evidence establishes occurred with the challenged transfers to Dvele for the purchase of the Dvele homes.

25

We are not persuaded by Nicole's argument that Scott's capital contributions were not made "to" the Company.

Nicole lastly argues that the trial court improperly determined that the date of Scott's last two capital contributions was September 18, 2023, which was the date the trial court signed the Monetization Plan.[10]  Nicole argues that the trial court should instead have used the date of the later Order because the Monetization Plan "expressly reserved the question of whether the Company owned the Dvele homes" for the later trial regarding the parties' member-retained claims.  She argues that the trial court's use of the September 18 date "as the capital contribution date makes clear that the court thought the homes were part of [the Company] at that time—which is exactly what the parties disputed and reserved for decision later."  But the Monetization Plan, by which the parties agreed that the Supervisors would market and sell the Basecamp development, including the Dvele Homes already located therein, operates effectively as an agreement by the parties that the Company *did* in fact own the Dvele Homes as of that date by agreement of the parties.  Otherwise, the Supervisors charged with selling the assets belonging to the Company could not have been authorized to sell the Dvele Homes, nor could the homes have been included in the later asset purchase agreement the trial court signed.

Furthermore, Nicole misconstrues the language in the Monetization Plan.  Rather than expressly reserving the question of whether the Company "owned" the Dvele homes until trial, the Monetization Plan specifies that (1) "any specific *value* a winning buyer attributes to the Dvele Homes . . . shall not be binding on . . . Nicole Roberts or Scott Roberts with respect to the

---

[10] The evidence shows that Scott made those last two contributions before that date, but Scott has not appealed the trial court's determination of the later date.  The date on which the contributions were deemed made is significant because Scott's 10% priority return is calculated from such date going forward.

26

Member Related Claims" and (2) "the sale of the existing Dvele Homes" is "not an admission or waiver" *by either party* "regarding any Member Related Claims . . . involving the Dvele Homes." That language does not reflect an agreement to reserve until trial the question of whether the Company owned the Dvele homes; rather, it merely specifies that a winning bidder's value for the homes is not binding on the parties' member-retained claims and that the inclusion of the homes in the sale of the Company's assets does not constitute a waiver or admission by either party of their member-retained claims.

The trial court could reasonably have found that on the date of the Monetization Plan, Scott unequivocally relinquished any interest he had in the Dvele homes to the Company, resulting from his previous expenditures to purchase the homes, and therefore that such date effectively constituted the date on which he made a contribution of cash or property to the Company so as to constitute a capital contribution under the Operating Agreement's definition. We overrule Nicole's third issue.

## CONCLUSION

Having overruled Nicole's appellate issues, we affirm the trial court's order.

 

_____

Karin Crump, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed: November 18, 2025

27